OPINION OF THE COURT
Herman Cahn, J.
These consolidated shareholder class actions arise from the precipitous collapse of the Bear Stearns Companies, Inc. (Bear Stearns and the company) and the consequent, federally-assisted merger with JPMorgan Chase & Co. in a stock-for-stock deal with an implied value of $10 per share. Challenging the consideration as inadequate, plaintiffs seek damages from Bear Stearns’ directors for claimed violation of their fiduciary duties, and from JPMorgan for its allegedly tortious conduct in effecting the merger.[1]
Defendants Bear Stearns and JPMorgan now move for summary judgment (CPLR 3212) dismissing the actions.
For the reasons discussed below, the actions are dismissed. The court concludes that Bear Stearns board of directors’ approval of the merger does not subject them to liability because the decisions are protected by the business judgment rule and the officers and directors are shielded by the exculpatory provisions of Bear Stearns’ certificate of incorporation. The board’s efforts to preserve some shareholder value while averting the uncertainty of a bankruptcy — an event with potentially cataclysmic consequences for the broader economy as well as for the shareholders — would survive scrutiny even if some enhanced standard of review under Delaware law did apply. For related reasons, JPMorgan’s participation in negotiating the merger also does not give rise to penitential liability.
*449 Facts
The following facts are taken from the parties’ statements pursuant to rule 19-a of the Rules of the Justices of the Commercial Division (22 NYCRR 202.70 [g]), and the pleadings, affidavits, deposition transcripts and documentary evidence submitted with the motion papers.
The Parties
Defendant Bear Stearns, a Delaware corporation, was a holding company that, through various broker-dealer and international bank subsidiaries,[2] was a leading investment banking, securities and derivatives trading, clearance and brokerage firm. It served corporate, governmental, institutional and individual investors worldwide. As of February 20, 2008, Bear Stearns had 145,633,335 common shares and 1,757,397 shares of preferred stock outstanding. Bear Stearns also had more than $70 billion in outstanding unsecured debt.
During the relevant period, Bear Stearns’ directors were defendants Henry S. Bienen, Carl D. Glickman, Michael Gold-stein, Donald J. Harrington, Frank T. Nickell, Paul A. Novelly, Frederic V Salerno, Vincent Tese, Wesley S. Williams, Jr., James E. Cayne, Alan D. Schwartz and Alan C. Greenberg (the director defendants). Three of the director defendants, Schwartz, Cayne and Greenberg, were also members of Bear Stearns’ management, with Schwartz serving as its president and chief executive officer. Nine of the directors were “outside directors” with broad business and life experience.[3]
Defendant JPMorgan, a Delaware corporation, is a global financial services firm with assets of $1.6 trillion and operations in more than 60 countries. JPMorgan’s chairman and CEO is James Dimon. Dimon is also one of nine directors of the New York Federal Reserve (NY Fed).
*450 Plaintiffs are Bear Stearns shareholders,[4] allegedly injured by the company’s merger with JPMorgan, suing individually and as representatives of similarly situated shareholders.
Bear Stearns’ Liquidity Crisis
On Monday March 10, 2008, Moody’s Investors Services downgraded certain series of mortgage-backed debt issued by an affiliate of Bear Stearns, and questions regarding Bear Stearns’ liquidity began circulating in the market. Bear Stearns issued a press release denying the market rumors. Moody’s issued a statement noting that it had not taken any adverse rating action regarding Bear Stearns’ corporate debt and that Bear Stearns’ rating outlook was stable. Nevertheless, by late Wednesday, March 12, an increased number of customers expressed a desire to withdraw funds from Bear Stearns, and certain counterparties expressed concern over maintaining their ordinary course of exposure to Bear Stearns.
Concerned that the company’s liquidity could be compromised, Bear Stearns’ senior management met with its financial advisor, hazard Freres & Co., LLC, on the evening of March 12, 2008 to discuss the issues raised by the market speculation. On Thursday, March 13, 2008, the Wall Street Journal reported that, due to the market perception of Bear Stearns’ liquidity problems, trading counterparties were becoming cautious about their dealings with, and exposure to, the company. Over the course of the day, and particularly at an increasing rate in the afternoon, an unusual number of customers withdrew funds from Bear Stearns. In addition, a significant number of counter-parties appeared unwilling to provide the short-term, fully secured funding customary in the investment banking business which was necessary for the company’s operations. By the end of the day, Bear Stearns found that its liquidity had deteriorated sharply and that there was a reasonable chance that it would not have enough cash to meet its needs the next day.
*451 The Federal Loan Facility
During the evening of March 13, Bear Stearns’ senior management met with the company’s legal and financial advisors to discuss the liquidity problem and explore potential options. Senior management had been in contact with the NY Fed, the Securities and Exchange Commission (SEC) and representatives of the United States Treasury Department to inform them of Bear Stearns’ condition. In addition, Schwartz contacted JP-Morgan chairman Dimon to seek funding assistance or some other solution to Bear Stearns’ liquidity problem, including a possible business combination.
At 10:30 p.m. that evening, Bear Stearns’ board held a special meeting at which its senior management and legal and financial advisors discussed the liquidity problem, and the possibility that the company would not be able to meet its operational needs the next day, absent the identification of sufficient funding sources. The board was informed that customers were withdrawing billions of dollars, counterparties were refusing to roll over their repurchase agreement or do business with Bear Stearns, and the company was receiving and meeting margin calls. Following that meeting, representatives of JPMorgan and officials of the Treasury Department, the NY Fed and the Federal Reserve Board held discussions throughout the night. They ultimately agreed to a temporary NY Fed-backed loan facility (the loan facility). Pursuant to that arrangement, for a period of up to 28 days, JPMorgan would fund Bear Stearns on a fully-secured basis, supported by a back-to-back loan facility which permitted JPMorgan to borrow similar funds from the NY Fed through its discount window on a nonrecourse basis.
At a reconvened meeting at 8:00 a.m. Friday, March 14, 2008, Schwartz updated the board on the loan facility. At the conclusion of the meeting, the board authorized Bear Stearns to enter into the arrangement. Prior to the opening of the markets that day, Bear Stearns issued a press release announcing the loan facility and disclosing its discussion of alternatives with JPMorgan. Around noon, Bear Stearns’ senior management held a public investor conference to discuss the loan facility and disclose its retention of hazard to explore other options.
hazard spoke to over a dozen potential merger partners over the next few days, ultimately reporting to the board that only JPMorgan and J.C. Flowers, a private equity firm, had expressed meaningful interest.
*452 Bear Stearns’ Continued Financial Instability
Despite Bear Stearns’ announcement of the loan facility and discussions with JPMorgan, customers and counterparties continued to abandon the company. On March 14 its common stock price closed down 47% from the previous day. Additionally, that afternoon three major rating agencies, Standard and Poor’s, Moody’s and Fitch Ratings, downgraded Bear Stearns’ long-term and short-term credit ratings two to four notches from the day before and stated that they would continue to review the company’s ratings with consideration of possible further downgrades. On the evening of March 14, the NY Fed informed Bear Stearns that the loan facility would no longer be available as of the upcoming Monday morning, March 17, 2008. Treasury Secretary Henry Paulson also advised Schwartz that Bear Stearns needed to complete a stabilizing transaction by the end of the weekend.
The Initial Merger Negotiations
Bear Stearns determined that it would not be able to open for business Monday in the absence of an alternative source of funding. Its management estimated the funding requirements for that day to be in the range of $60 billion to $100 billion. The company determined that its only options were to complete a “stabilizing” transaction over the weekend or file for bankruptcy Monday morning (defendant Bear Stearns rule 19-a statement 1i 24).
Accordingly, on Saturday, March 15, 2008 representatives of Bear Stearns and JPMorgan met to discuss a potential deal. Lazard also contacted various potential buyers and parties capable of providing alternative funding, and provided “due diligence” material to JPMorgan and J.C. Flowers, which were the only parties that expressed an interest in completing a stabilizing transaction, such as a merger, on an expedited basis. A separate Bear Stearns team considered the consequences of bankruptcy and prepared for the possibility of filing for bankruptcy if a stabilizing transaction were not consummated by late Sunday.
On Saturday afternoon, J.C. Flowers presented a proposal to contribute $3 billion to Bear Stearns in exchange for a 90% equity interest. The proposal required a $20 billion credit facility from a yet-to-be-assembled consortium of banks. J.C. Flowers was given permission to contact financial institutions to seek their participation, but later that evening indicated that it was having difficulty finding suitable candidates.
*453 On Saturday evening, JPMorgan indicated that it was considering a stock-for-stock transaction in which Bear Stearns stockholders would receive JPMorgan stock with an implied value of between $8 and $12 per Bear Stearns share (defendant Bear Stearns rule 19-a statement 1! 31). Bear Stearns expressed interest at that price level. It insisted that any offer would have to be firm and could not be subject to any material conditions precedent such as the accuracy of representations and warranties. With the encouragement of the NY Fed and the Treasury, both JPMorgan and J.C. Flowers continued to conduct due diligence and hold discussions with Bear Stearns until early in the morning of Sunday, March 16.
Later that Sunday morning, JPMorgan advised Lazard that due to the risks of a merger it could not proceed without some level of financial and other support from the NY Fed. JPMorgan continued to work with Bear Stearns toward a transaction, and also pursued discussions with the NY Fed. The NY Fed ultimately agreed to provide $30 billion of nonrecourse funding secured by a pool of Bear Stearns collateral consisting primarily of mortgage related securities and other mortgage related assets and hedges. According to officials of the Federal Reserve, the governmental intervention was premised on a concern that a sudden and disorderly failure of Bear Stearns would have “unpredictable but likely severe consequences for market functioning and the broader economy” (Markel aff, exhibit DD, at 3). It would also likely pose “the risk of systemic damage to the financial system” (id., exhibit K, at 5).
Late on the afternoon of Sunday, March 16, JPMorgan indicated that it was interested in a stock-for-stock merger with Bear Stearns at an implied value of $4 per share for Bear Stearns stock, a figure shortly thereafter reduced to $2 per share. Bear Stearns objected to the price and suggested a term requiring JPMorgan to pay additional consideration if certain Bear Stearns assets were sold for more than JPMorgan valued them. JPMorgan declined to increase the price, a position which Bear Stearns’ management understood to be, in part, a consequence of the Treasury’s insistence.
In discussions of the transaction, the board was informed that without a deal, Bear Stearns would have to file for bankruptcy immediately, in which case its stockholders would likely receive nothing and the holders of Bear Stearns’ unsecured $70 billion debt might suffer significant loss. Lazard issued an opinion that the “Exchange Ratio is fair, from a financial point *454 of view, to the holders of the Company Common Stock” (Markel aff, exhibit at 4). The fairness opinion was executed by Larry W. Parr, Lazard’s deputy chairman.
Bear Stearns’ board approved an initial merger agreement on Sunday, March 16, 2008. The agreement provided for a share-for-share merger at an implied price of $2 per share, which was a fixed exchange ratio of 0.05473 shares of JPMorgan common stock for each share of Bear Stearns common stock. JPMorgan provided an immediate initial guaranty (the initial guaranty) of various Bear Stearns’ obligations, with the NY Fed providing supplemental funding of up to $30 billion.
Under the initial merger agreement, JPMorgan received an option to purchase 19.9% of Bear Stearns’ stock at $2 per share, and to purchase Bear Stearns’ headquarters building at Madison Avenue, New York, New York, for $1.1 billion (the building purchase option).
The agreement also contained a “no solicitation” clause which prohibited Bear Stearns from actively soliciting alternative proposals (defendant’s brief, exhibit I, § 6.9). However, the provision allowed the company to consider and participate in discussions and negotiations and provide information with respect to a bona fide alternative proposal received by the company, if and only to the extent that, and so long as the board of directors of the company reasonably determines in good faith (after consultation with outside legal counsel) that, failure to do so would cause it to violate its fiduciary duties to the company stockholders under applicable law (id.). The board was permitted to accept another proposal if it was a “Superior Proposal,” defined as an offer for 100% of Bear Stearns’ common stock and assets which was more financially favorable than the JPMorgan merger and reasonably capable of being completed by a third party qualified to obtain the necessary financing.
Bear Stearns resumed business on Monday, March 17, 2008. During the week, the NY Fed directly loaned the company approximately $30 billion each day and JPMorgan loaned it approximately another $13.4 billion. However, Bear Stearns’ customers continued to withdraw funds and counterparties remained unwilling to provide secured financing on customary terms.
The Merger Renegotiations
Due to concerns over its continuing obligation to guarantee Bear Stearns’ obligations, on Tuesday, March 18, 2008, JPMor *455 gan contacted Bear Stearns’ legal advisors to discuss revisions to the initial merger agreement. JPMorgan advised Bear Stearns that it was skeptical of its ability to continue to extend credit or guarantee the loans in the face of market fears over Bear Stearns’ viability and the perceived risk that the merger might not be completed. On Friday, March 21, 2008, JPMorgan proposed that Bear Stearns issue a sufficient number of additional shares to give JPMorgan a two-thirds common stock interest and, thus, increase the certainty that the merger would close. Bear Stearns rejected the stock proposal and indicated that it would require a significant increase in the merger consideration for any revision of the initial merger agreement.
On Saturday, March 22, 2008, Bear Stearns CEO, Schwartz, informed the board that uncertainty over the terms of JPMorgan’s guarantee was causing the market to eschew trading with Bear Stearns. He indicated that JPMorgan was concerned about its liability under the initial guaranty if the shareholders voted down the merger, and that JPMorgan sought to enable either party to have the right to terminate the agreement under such an outcome. Schwartz also apprised the board of the continuing efforts of counsel to prepare for a potential bankruptcy, which he stated was Bear Stearns’ only option if the NY Fed and JP-Morgan were unwilling to continue funding on Monday, March 24, 2008. Bear Stearns’ board was advised that if the company filed for bankruptcy, its bankruptcy estate could potentially pursue litigation against JPMorgan for refusing to fund its operations.
The Amended Merger Agreement
Negotiations over revisions to the initial merger agreement continued throughout the weekend, with the participation of the NY Fed. In addition to hazard, Bear Stearns retained four law firms as advisors, Skadden Arps, Sullivan & Cromwell, Cadwalader, Wickersham & Taft and Richards, Layton & Finger. The parties reached an agreement on early Monday morning, March 24. Most relevant, under the amended merger agreement the merger consideration was increased to an implied value of approximately $10 per share. JPMorgan was required to guarantee Bear Stearns’ current and future borrowings from the NY Fed. JPMorgan’s obligation to guarantee Bear Stearns’ trading obligations, in the event of a negative vote on the merger, was reduced from one year to 120 days. Furthermore, JPMorgan was permitted to purchase 95 million shares of Bear Stearns’ common stock, at $10 per share (the share exchange *456 agreement), for a 39.5% interest. As part of the renegotiation, JPMorgan and. the NY Fed separately agreed to modify the $30 billion special funding facility, that would go into effect upon consummation of the merger. This was so that JPMorgan would assume up to the first $1 billion of any losses on the collateral provided to the NY Fed. The amended merger agreement also required all of the director defendants to resign at the effective time of the merger.
The Shareholder Approval of the Merger
Between April 11 and April 28, 2008, JPMorgan filed various forms with the SEC disclosing the terms of the transaction, the history of the negotiations and the perceived risks of the transaction. On May 29, 2008, a majority of Bear Stearns’ stockholders voted to approve the merger transaction. Stockholders representing 84.55% of the 240,739,293 outstanding eligible shares, including JPMorgan, participated in the vote. With abstentions and unvoted shares counting against the merger, the transaction passed with 71% of the vote. Had the 39.5% block of shares issued to JPMorgan been excluded, the merger would still have passed with 52% of the vote. However, if all of JPMorgan’s shares had been excluded, including the 10% of the outstanding shares purchased on the open market, the measure would have failed with a 42.7% vote.
The merger closed on May 30, 2008.
Procedural History
On March 27, 2008, prior to the shareholder vote on the merger, plaintiffs filed a consolidated amended class action complaint asserting causes of action for breach of fiduciary duty against the director defendants, for a declaratory judgment to set aside the share exchange agreement, for aiding and abetting a breach of fiduciary duty against JPMorgan and for equitable assessment of attorneys’ fees and expenses against all the defendants.
Pursuant to the expedited discovery agreed upon by the parties and ordered by the court on March 26, 2008, defendants, along with third parties hazard and the Federal Reserve, engaged in document production between March 30, 2008 and April 13, 2008. Plaintiffs took depositions of various defendants, hazard and the NY Fed in April 2008.[5]
On April 24, 2008, plaintiffs filed the second verified consolidated amended class action complaint, adding causes of *457 action for breach of fiduciary duty and unjust enrichment against JPMorgan and a specific cause of action to enjoin the merger and to nullify the voting rights of the Bear Stearns shares issued to JPMorgan.
Plaintiffs moved for a prehminary injunction seeking to enjoin Bear Stearns from treating those shares as validly issued for purposes of voting or exercising rights to consent. Plaintiffs withdrew the motion, advising that they were no longer seeking to enjoin the transaction or to enjoin JPMorgan from voting the Bear Stearns shares it had acquired on April 8, 2008.
On May 30, 2008, plaintiffs filed the third verified consolidated amended class action complaint.
The Expert Opinions
Apart from legal arguments addressing the terms of the merger transaction and the circumstances surrounding its negotiation, plaintiffs’ challenge to the judgment of Bear Stearns’ board places significant reliance upon expert affidavits. Defendant JPMorgan also submitted an expert opinion, relied upon in part by Bear Stearns, addressing factors relevant to the board’s decision to accept the merger and some of the concerns raised by plaintiffs’ experts. Accordingly, a brief summary of these opinions is helpful.
Plaintiffs’ Experts
Steven A. Wolf
Wolf is a certified public accountant, a certified fraud examiner, and a managing director of UHY Advisors Forensic, Litigation and Valuation Practice. Wolf concludes that the board did not adequately consider or research (1) whether there were alternatives to JPMorgan’s $2 and $10 offers, including a bankruptcy filing, and (2) whether the only outcome of a bankruptcy filing was a liquidation of the company’s assets.
Wolf faults Lazard for assuming that the stockholders would receive nothing in bankruptcy without undertaking an independent analysis of the potential recovery. He also states that it is “probable” that over the weekend of March 15-16, 2008, Bear Stearns could have pursued other strategies which may have forestalled the need for a bankruptcy filing, changed the nature or course of any bankruptcy proceeding, and significantly increased the probability the shareholders would recover more in a bankruptcy (Wolf aff at 4). Furthermore, Wolf concludes *458 that the “additional intrinsic value” of Bear Stearns’ stock is established by JPMorgan’s increase of its original offer, even if it was only a premium for deal certainty (icl.).
As to bankruptcy alternatives, Wolf suggests that Bear Stearns could have sold certain assets, possibly raising $3 to $5 billion from its prime brokerage business and $1 billion from its headquarters building. Wolf opines that “it is entirely possible” that the cash influx might have stabilized the company while it investigated other options (id. at 17). He also states that the asset sales, either before or in connection with a bankruptcy filing, might have “dramatically changed the outcome” of the proceedings by allowing for a more orderly process in which to pursue recovery (id.).
Finally, while Wolf acknowledges that bankruptcy law would not have permitted Bear Stearns to continue as a broker/dealer, he suggests that the company could have spun off that part of its business and sought debtor-in-possession (DIP) financing for its remaining operations. He notes that Drexel Burnham Lambert took that approach in 1990. Wolf suggests that Bear Stearns’ insistence on pursuing a transaction involving the entire company may have been the reason it had difficulty finding corporate suitors other than JPMorgan.
Matthew Morris
Morris is managing director of Fin Econ Partners, a financial advisory firm. Morris was retained to evaluate (1) the financial impact of Bear Stearns’ issuance of 95 million shares of common stock to JPMorgan, (2) the March 16, 2008 fairness opinion by Lazard, and (3) market evidence relating to Bear Stearns’ value.
With respect to the share exchange agreement, Morris points out that JPMorgan would receive $95 million for every dollar a competing company bid over the $10 share price. Morris calls that profit an “effective termination fee,” noting that on an $11 per share bid, JPMorgan would receive a fee equivalent to 6.5% of the merger value (Morris aff at 3). A $13 bid would result in a 20% fee, with the percentages increasing as the per share bid rose. Morris asserts that the average termination fee for transactions in the $250 million to $10 billion range is under 3% of deal value. He concludes that JPMorgan’s higher fee, coupled with its option to purchase Bear Stearns’ headquarters building, made third-party offers more expensive and, therefore, less likely.
*459 Morris faults the hazard fairness opinion for failing to address Bear Stearns’ value under the assumption that funding could be obtained from the Federal Reserve or other sources, and for failing to consider market indications of the company’s value prior to March 2008. He contends hazard underestimated Bear Stearns’ value, noting that its mortgage and other potential risk positions represented only $41.9 billion of the company’s total $400 billion in assets. Morris notes that analyst estimates of Bear Stearns’ worth, just prior to the liquidity crisis, ranged from $45 to $160 per share, with the average estimate in the $100 range. Although he recognizes that those values did not factor in the liquidity crisis, he finds them useful to estimate a ceiling for the stock’s value. Morris’ own estimate of Bear Stearns’ per share worth, after accounting for risky asset categories, is $58.
Morris also finds it significant that the price of JPMorgan’s common stock increased from $36.54 to $40.31 after the announcement of the merger, noting that it represented a $13.8 billion increase in JPMorgan’s market value. Assuming that most of the increase is attributable to the market’s perception of the value of the deal to JPMorgan, Morris estimates that it “translated into a market-indicated underpayment for Bear Stearns of as much as $94.66 per share” (id. at 9). Finally, based on public comments made by JPMorgan following the initial merger agreement announcement regarding Bear Stearns’ projected earnings, Morris calculates a value of between $21 and $31 per share.
Thomas A. Myers
Myers is a certified public accountant and an author, lecturer and forensic consultant to the financial services industry and its regulators on complex financial and accounting matters. His opinion focuses on the motivations and conduct of JPMorgan and the financial regulators involved with the merger. Myers contends that there was an aversion in the financial community, including the Treasury Department, to the liquidation of Bear Stearns level 3, illiquid, assets that might have worked to Bear Stearns’ advantage (Myers aff H 4.1). Specifically, he contends that any bankruptcy-related sales of those assets would establish “deeply discounted observable market prices” and trigger massive write-downs on similar assets held by other financial institutions (id. 1Í 6). Because this domino effect might have caused “a world-wide economic calamity,” Myers asserts the financial community and government agencies had a substantial *460 incentive to insure that the market value of the level 3 assets were not revealed in the course of the bankruptcy proceeding {id. 1i 34). He thus opines that Bear Stearns would have received substantial support, including DIP financing, from the financial community and governmental agencies had it filed for bankruptcy.
Myers also criticizes JPMorgan chairman and CEO James Dimon for his participation in the merger negotiations despite an alleged conflict of interest arising from Dimon’s position as a director of the NY Fed. Myers notes that as a substantial JP-Morgan shareholder, Dimon had a financial interest in the outcome of the merger. Myers suggests that Dimon may have influenced the government’s extension of the $30 billion loan facility, and that Dimon would “certainly be conflicted regarding the evaluation of a number of the options not pursued by the Federal Reserve that would be inimical to J.P. Morgan’s interests, including ‘taking a tougher line with J.E Morgan’ and cultivating other sources for the deal (i.e., other than J.P. Morgan)” {id. If 59). Myers also concludes that the Bear Stearns board abrogated its responsibility to pursue other options by ceding control over the negotiations to Dimon, and that “J.E Morgan took advantage of its backing by the New York Federal Reserve Bank to gain concessions that otherwise would not be available in an unassisted acquisition of Bear Stearns” {id. If 4, at 35).
Defendants’ Expert
Stuart C. Gilson
Gilson is a professor of business administration at Harvard Business School. Gilson confirms that, as a result of a “run on the bank,” Bear Stearns was liquidity insolvent as of March 15-16, 2008 and again as of March 22-23, 2008 (Gilson aff 1f 5). Gil-son contends that on each occasion, Bear Stearns’ only alternatives were to accept the offer proposed by JEMorgan or to file for bankruptcy. He opines that if Bear Stearns had filed for bankruptcy, its bondholders would not have received payment in full and the shareholders would have suffered a total loss.
In his rebuttal affidavit, Gilson disputes certain conclusions drawn by the Wolf and Myers expert affidavits. He concludes that none of the bankruptcy alternatives proposed by Wolf were feasible in view of the magnitude of the liquidity crisis and the time constraints facing the parties. Gilson observes that the $6 billion in asset sales proposed by Wolf would have been insufficient to fund Bear Stearns daily operations, which require *461 $60 billion to $100 billion, or repay the company’s unsecured bond debt of $70 billion. He disputes the contention that asset sales would have stopped customer withdrawals, reassured counterparties or prevented employees and clients of Bear Stearns’ businesses from defecting to other firms. Gilson rejects Wolfs suggestion that Bear Stearns should have followed the Drexel example, and spun off its brokerage business and operated the rest in bankruptcy, noting, inter alia, that the Drexel shareholders received nothing.
Finally, Gilson rejects Myers’ conclusion that Bear Stearns could have received financing in bankruptcy. He asserts that it was “highly implausible that any prospective DIP lender would consent to lend money that would be used to repay obligations to Bear Stearns’ other financial creditors,” and notes that there is no indication that the NY Fed would have financed a bankrupt Bear Stearns because the purpose of its financing was to prevent a bankruptcy in the first instance and to avoid the effects of a bankruptcy on the financial markets (Gilson rebuttal aff 1i 15).
Discussion
The Bear Stearns Director Defendants’ Motion for Summary Judgment
The first claim, for breach of fiduciary duty, asserted against the Bear Stearns director defendants is dismissed and summary judgment is granted to the director defendants.
Breach of Fiduciary Duty
Plaintiffs argue that the director defendants breached the fiduciary duty that they owed to the Bear Stearns shareholders. “Generally, ‘[a] fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another’ ” (Wal-Mart Stores, Inc. v AIG Life Ins. Co., 901 A2d 106, 113 [Del 2006], quoting Wal-Mart Stores, Inc. v AIG Life Ins. Co., 872 A2d 611, 624 [Del Ch 2005]).
The Business Judgment Rule
As a threshold question, and before evaluating the propriety of the conduct of Bear Stearns’ board, the court must determine which of the standards of review proposed by the parties applies under the circumstances.
“The appropriate standard of judicial review is dis-positive of which party has the burden of proof as *462 any litigation proceeds from stage to stage until there is a substantive determination on the merits. Accordingly, identification of the correct analytical framework is essential to a proper judicial review of challenges to the decision-making process of a corporation’s board of directors” (Omnicare, Inc. v NCS Healthcare, Inc., 818 A2d 914, 927 [Del 2003]).
Under Delaware law, which governs as it is the state in which both defendants were incorporated, the “business and affairs” of a Delaware corporation, like Bear Stearns, are “managed by or under the direction of a board of directors” (Del Code Ann, tit 7, § 141 [a]). This responsibility “carries with it certain fundamental fiduciary obligations to the corporation and its shareholders” (Aronson v Lewis, 473 A2d 805, 811 [Del 1984], partially overruled on other grounds by Brehm v Eisner, 746 A2d 244 [Del 2000]). The core duties are those of loyalty and due care (see Stone ex rel. AmSouth Bancorporation v Ritter, 911 A2d 362 [Del 2006]).
Under the business judgment rule, there is “a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company” (Aronson, 473 A2d at 812). “The rule operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation” (Cede & Co. v Technicolor, Inc., 634 A2d 345, 360 [Del 1993]). Accordingly, the board of directors’ decisions “will not be disturbed if they can be attributed to any rational business purpose” (Sinclair Oil Corp. v Levien, 280 A2d 717, 720 [Del 1971]).
The rule is “both a procedural guide for litigants and a substantive rule of law” (Citron v Fairchild Camera & Instrument Corp., 569 A2d 53, 64 [Del 1989]). Procedurally, the rule places the initial burden on the shareholder plaintiffs to rebut the presumption (Aronson, 473 A2d at 812), which may be done by demonstrating “that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith” (In re Walt Disney Co. Derivative Litig., 906 A2d 27, 52 [Del 2006]). A lack of loyalty may be evidenced by a showing that “the directors are interested or lack independence relative to the decision,” and a lack of care by establishing the use of a “grossly negligent process that includes the failure to consider all material facts reasonably available” (Brehm, 746 A2d at 264 n 66). Bad faith “is not simply bad judgment or negligence, but rather implies the *463 conscious doing of a wrong because of dishonest purpose or moral obliquity ... it contemplates a state of mind affirmatively operating with furtive design or ill will” (McGowan v Ferro, 859 A2d 1012, 1036 [Del Ch 2004] [citations omitted]). Bad faith
“may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties” (Disney, 906 A2d at 67).
Although the business judgment rule may be rebutted by establishing a breach of fiduciary duties, liability does not automatically attach upon such a showing. Rather, “the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders” (id. at 52). Furthermore, director liability may be circumscribed where, as here, pursuant to Delaware Code Annotated, title 8, § 102 (b) (7), the corporate certificate of incorporation contains a provision barring monetary damages for a violation of the duty of care.[6] Where such a limiting clause exists, conduct implicating bad faith or a breach of the duty of loyalty must be established (see Stone, 911 A2d at 367). A showing of gross negligence alone, including the failure to ascertain the available material facts, will not suffice (Disney, 906 A2d at 64-65).
However, notwithstanding the general applicability of the business judgment rule, Delaware courts have also employed other, heightened, standards for the review of certain corporate actions.
*464 Under the Unocal test, “there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred” (Unocal Corp. v Mesa Petroleum Co., 493 A2d 946, 954 [Del 1985]). This level of scrutiny applies “whenever the record reflects that a board of directors took defensive measures in response to a perceived threat to corporate policy and effectiveness which touches upon issues of [corporate] control” (Unitrin, Inc. v American Gen. Corp., 651 A2d 1361, 1372 n 9 [Del 1995] [internal quotation marks omitted]). The higher Unocal standard applies because of “the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders” (Unocal, 493 A2d at 954).[7] Although first arising in the hostile takeover context, the Unocal standard also applies when the board employs certain “deal protection devices” to protect a proposed merger transaction against uninvited competing bids (Omnicare, 818 A2d at 932).
An even stricter standard, requiring a “compelling justification,” applies under the Blasius test, which is invoked “[when] a board acts . . . for the primary purpose of preventing or impeding an unaffiliated majority of shareholders from expanding the board and electing a new majority” (Blasius Indus., Inc. v Atlas Corp., 564 A2d 651, 652 [Del Ch 1988]; see MM Cos., Inc. v Liquid Audio, Inc., 813 A2d 1118 [Del Sup Ct 2003]). Because the Blasius standard is “quite onerous,” it is “applied rarely” (Williams v Geier, 671 A2d 1368, 1376 [Del 1996]). Rather, it “should be reserved largely for director election contests or election contests having consequences for corporate control” (Mercier v Inter-Tel [Del.], Inc., 929 A2d 786, 809 [Del Ch 2007]).
Finally, a corporate board’s conduct may also be subject to enhanced scrutiny under the Revlon standard, where the *465 questioned transaction involves a sale or change of control of the company (see Revlon, Inc. v MacAndrews & Forbes Holdings, Inc., 506 A2d 173 [Del 1986]; Paramount Communications Inc. v QVC Network Inc., 637 A2d 34 [Del 1994]). It may thus be triggered by a cash merger, or a stock-for-stock merger where there is “no tomorrow” for the shareholders because the stock received is under the control of a single individual or group (Equity-Linked Invs., L.P. v Adams, 705 A2d 1040, 1055 [Del Ch 1997]). Revlon duties are not ordinarily implicated, however, in a stock-for-stock merger of widely-held public companies, where “[c]ontrol of both [companies] remain[s] in a large, fluid, changeable and changing market” (Arnold v Society for Sav. Bancorp., Inc., 650 A2d 1270, 1290 [Del 1994]; Krim v ProNet, Inc., 744 A2d 523 [Del Ch 1999]).
Here, in an effort to avoid the business judgment rule, plaintiffs argue that some form of heightened scrutiny applies under Unocal, Blasius and/or Revlon. They contend that the director defendants impermissibly allowed the incorporation of a combination of onerous and coercive deal protection devices into the amended merger agreement. They specifically complain of: (1) the share exchange agreement through which Bear Stearns issued to JPMorgan approximately 39.5% of its common stock, referred to by plaintiffs as the “Lock Up Stock Sale”; (2) the “no solicitation” clause defining under which circumstances Bear Stearns could accept alternative, superior proposals from other bidders, denominated by plaintiffs as a “no shop” provision; and (3) the option permitting JPMorgan to purchase Bear Stearns headquarters for $1.1 billion, which plaintiffs designate, together with the “Lock Up Stock Sale,” as a “termination fee.” Plaintiffs concede that termination fees, no-shop provisions, lock-up stock sales and other deal protection provisions are usually acceptable under Delaware law. However, they argue that, here, the combination of measures disenfranchised the shareholders and depressed the ultimate purchase price (plaintiffs’ brief, § III, at 55).
Plaintiffs have failed to establish that a heightened standard of review should be applied and, accordingly, the business judgment rule is controlling.
There is no evidence that the board — comprised of a majority of nonmanagement, nonemployee directors and assisted by teams of financial and legal advisers — acted out of self-interest or in bad faith. These board members had no financial or other interest distinct from that of the Bear Stearns stockholders at *466 large. None of them had. any affiliation with the acquiring corporation, JPMorgan. The Bear Stearns board was not acting to preserve its power in response to overtures by an unwanted suitor or other uninvited bids. Indeed, any claim regarding an entrenchment motive is conclusively negated by the provision in the amended merger agreement requiring the director defendants to resign.
Other of plaintiffs’ arguments rest largely on expert affidavits speculating about Bear Stearns’ alleged true value and the claimed superiority of various bankruptcy options. These opinions, however, do not take into sufficient consideration the very real emergency which the company faced, and the real time pressure under which Bear Stearns’ officers and directors were operating. The company could simply not continue to carry on its major operations on Monday morning, unless it had put some major financing, or a major transaction which would carry with it major financing, into place. No options appeared to be available other than the merger transaction with JPMorgan. The various alternatives, suggested by plaintiffs and their experts, could not reasonably have been consummated by the opening of business on Monday morning. In their absence, and in view of the market pressure and the pressure exerted by the Treasury Department, the company would have been driven into bankruptcy. To expect greater assistance than was offered from the various governmental entities, including the Treasury Department, was apparently not considered prudent by the board of directors, which was ultimately charged with the responsibility of making the decision. In response to a sudden and rapidly-escalating liquidity crisis, Bear Stearns’ directors acted expeditiously to consider the company’s limited options. They attempted to salvage some $1.5 billion in shareholder value and averted a bankruptcy that may have returned nothing to the Bear Stearns shareholders, while wreaking havoc on the financial markets. The court should not, and will not, second-guess their decision.[8]
However, even if enhanced scrutiny was applied to the board’s decisions, plaintiffs’ claim against the director defendants would still fail.
If the transaction is viewed as “defensive,” under Unocal, there is still no showing negating that the directors reasonably *467 perceived and assessed a threat to the corporation. The liquidity crisis genuinely threatened Bear Stearns with extinction, and on three separate occasions within an 11-day period the company was on the verge of filing for bankruptcy. The threat was so severe that the Federal Reserve intervened to avoid a broader destabilization of the markets. The Bear Stearns board promptly retained competent, independent financial and legal advisers to explore its options. Further, the directors’ response was proportionate to the threat. Bear Stearns’ very survival and the benefit to shareholders therefrom, depended on consummating a transaction with a financially sound partner. Bear Stearns’ agreement to the share exchange agreement, the no solicitation clause and other provisions was essential to ensure JPMorgan’s willingness to undertake what it perceived as significant risks involved in guaranteeing Bear Stearns’ obligations, and to assure customers and counterparties that the deal would go through. Having contacted over a dozen other potential corporate parties without obtaining a viable alternative bid, its accommodation of JPMorgan’s contractual demands to insure increased deal certainty, and to placate the demonstrably unsettled market concerns, was neither “draconian” nor outside the “range of reasonableness” (Unitrin, 651 A2d at 1388).[9]
These same considerations satisfy any burden the director defendants might have had under Blasius, pursuant to which a compelling justification may be found where the “directors act for the purpose of preserving what the directors believe in good faith to be a value-maximizing offer” (Mercier, 929 A2d at 819). Despite the exigent circumstances, the directors were able to reject or moderate some of JPMorgan’s proposed terms. In connection with the initial merger agreement, Bear Stearns refused to grant an option to purchase its prime brokerage business unit and JPMorgan withdrew the demand. In negotiating the amended merger agreement, Bear Stearns also rejected a demand to issue to JPMorgan 66% of its common stock, compromising at 39.5%. Bear Stearns additionally obtained a fivefold increase in the implied per share consideration, from $2 *468 to $10. Insofar as the burdens under Unocal and Blasius are substantially satisfied where the transaction at issue is approved by a majority of outside, independent directors (Chesapeake, 771 A2d at 330), the record of the diligence of Bear Stearns’ board in confronting and resolving the crisis leaves little room for judicial review of its conduct.
Additionally, even if the director defendants had duties under Revlon to pursue maximum shareholder value, such a duty has been met.[10]
A satisfactory showing under Revlon has been made where, as here, the directors: were sophisticated and knowledgeable about the industry and strategic alternatives available to the company; were involved in the negotiation process and bargained hard; relied on expert advice; and received a fairness opinion from a financial advisor (see e.g. In re Toys “R” Us, Inc. Shareholder Litig., 877 A2d 975, 1016 [Del Ch 2005]; In re Pennaco Energy, Inc., 787 A2d 691, 705-706 [Del Ch 2001]; McMillan v Inter-cargo Corp., 768 A2d 492, 505 [Del Ch 2000]). Moreover, Revlon duties may be fulfilled where, as here, the corporation is operating under extreme time pressure and can locate only one bona fide bidder despite its best efforts to find competing offers. [11]
The “hoard’s actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence and in good faith” (Barkan, 567 A2d at 1286 [emphasis added]).
“[A] court applying enhanced judicial scrutiny should he deciding whether the directors made a reasonable decision, not a perfect decision. If a hoard selected one of several reasonable alternatives, a *469 court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board’s determination” (QVC, 637 A2d at 45 [emphasis added]).
The Merger Protection Provisions
The above squarely raises what was also addressed as a stand alone argument. The inclusion of the various merger protection provisions, intended to increase the certainty of the consummation of a transaction, may be subject to heightened scrutiny. This can occur where it appears that a corporate board has employed them to entrench itself at the expense of the shareholders in response to hostile takeover or a disputed election contest. Thus, again, a threshold determination must be made as to whether the measures were negotiated in one of the specific contexts calling for heightened scrutiny due to the potential for directorial misconduct.
Deal protection provisions are not reviewed in a vacuum, and will not be invalidated merely because they might have the potential — as all such devices definitionally do — to discourage or filter out subsequent bids. All of the cases upon which plaintiffs rely involve the invalidation of protective devices in one of the traditional Unocal, Blasius or Revlon settings.[12]
They are inapplicable here.
Unocal “starts from the premise that the transaction at issue was defensive” (Shamrock Holdings, Inc. v Polaroid Corp., 559 A2d 257, 271 [Del Ch 1989]). It is meant to insure that, in the face of a hostile third-party threat to corporate control, a board does not act in a self-interested fashion to unreasonably entrench itself at the expense of the stockholders. However, Unocal is inapplicable in a case where the board initiates the transaction in the absence of such an external threat (Gantler v Stephens, 2008 WL 401124, *8, 2008 Del Ch LEXIS 20, *24 [Feb. 14, 2008]).
The Blasius standard is similarly ill-fitting. Like Unocal, Blasius anticipates a defensive measure in response to a threat to *470 corporate control (see Mercier, 929 A2d at 809). Beyond this, its application has been largely limited to disputes over the election of directors.[13]
Accordingly, “courts will apply the exacting Blasius standard sparingly, and only in circumstances in which self-interested or faithless fiduciaries act to deprive stockholders of a full and fair opportunity to participate in the matter” (In re MONY Group, 853 A2d at 674). Of particular significance here, “the reasoning of Blasius is far less powerful when the matter up for consideration has little or no bearing on whether the directors will continue in office” (Mercier, 929 A2d at 808). Insofar as the deal protection devices were not adopted as defensive measures to maintain directorial control, the Blasius standard is inapplicable. Plaintiffs have certainly not shown that the directors’ primary purpose in approving the merger was to affect the shareholder franchise.
The Revlon standard, concerned with the sale or transfer of control, is also not applicable here. Bear Stearns’ issuance to JPMorgan of a 39.5% block of its shares was not a transfer of a controlling interest.[14]
Even after JPMorgan purchased an additional 10% on the open market, it did not become a majority shareholder. Rather, the public shareholders retained ultimate control. Plaintiffs’ conclusory averments that the merger constituted a sale or transfer of control, or made the breakup of Bear Stearns inevitable, do not alter the essential nature of the merger transaction.
Heightened scrutiny of the merger protection provisions is simply not warranted in the instant case.
*471 Inasmuch as none of the enhanced standards apply, the deal protection measures are reviewable only under the business judgment rule.[15]
Plaintiffs have not made the requisite showing of self-dealing or disloyalty. Rather, the board was apparently concerned with preserving Bear Stearns’ existence by ensuring a merger with the only bidder possessing the credibility and financial strength to help facilitate a government-assisted rescue.
Plaintiffs’ criticism of the magnitude of the alleged termination fee and the lock-up stock sale block as excessive or unprecedented is misplaced. As a preliminary matter, the Delaware courts do not “presume that all business circumstances are identical or that there is any naturally occurring rate of deal protection, the deficit or excess of which will be less than economically optimal” (In re Toys “R” Us, Inc. Shareholder Litig., 877 A2d 975, 1016 [2005]). Thus, the appropriateness of a fee or other protective measures “cannot be reduced to a mathematical equation” (Louisiana Mun. Police Employees’ Retirement Sys. v Crawford, 918 A2d 1172, 1181 n 10 [Del Ch 2007]).
Plaintiffs concede that there was no actual “termination fee” in either merger agreement, relying instead on Morris’ conclusion that the share exchange agreement and the building purchase option constituted an “effective” fee. Moreover, their analysis of each component of the alleged fee is flawed. Plaintiffs’ argument that the building purchase option represented a 36% fee rests on the assumption that the $1.1 billion price for the headquarters building was discounted $500 million from fair value, an allegation appearing solely in plaintiffs’ brief and with no basis in the record. To the contrary, the head of *472 Bear Stearns’ real estate group concluded that $1.1 billion represented the building’s fair value, an assessment not disputed by the Morris affidavit. Morris’ affidavit also appears to overstate the percentage “termination fee” represented by JPMorgan’s potential profit on its 95 million shares by assuming that the percentage should be calculated by reference to a fixed deal value of approximately $1.4 billion rather than the market value implied by the competing per share bid.
Most importantly, under any standard, it is clear that the no solicitation clause did not prevent Bear Stearns from entertaining additional offers or sharing the necessary information with prospective partners.[16]
Bear Stearns’ financial distress was extraordinarily well publicized and hazard had already solicited the most likely merger candidates. It simply cannot be said that the clause precluded any additional offers. In fact, it is quite apparent that there were no other potential or actual purchasers of Bear Stearns, in the circumstances which the company found itself. No other bidders were found despite hazard’s efforts. Thus, the no solicitation clause did not limit competition for Bear Stearns shares.
The financial catastrophe confronting Bear Stearns, and the economy generally, justified the inclusion of the various merger protection provisions intended to increase the certainty of the consummation of the transaction with JPMorgan.
The Transaction Options
To the extent that plaintiffs’ experts challenge the wisdom of the board’s decision to pursue a merger, rather than a spin-off, partial bankruptcy or sale of assets, or criticize some of the assumptions underlying hazard’s fairness opinions, they are irrelevant. “The gross negligence standard does not contemplate the submission of hindsight evidence to prove that the board or the advice the board relied upon may have been incorrect” (Giammalvo v Sunshine Min. Co., 1994 Wh 30547,*9 n 10, 1994 Del Ch hEXIS 6, *26 n 10 [1994]). The ultimate thrust of the opinions submitted by plaintiffs is merely that the board misjudged Bear Stearns’ true value and could have achieved a *473 better result had it instead pursued one of the experts’ preferred bankruptcy-related financing schemes. Such conclusions do not warrant the court’s second guessing the directors’ decisions, taken under extreme pressure and crisis conditions, in approving the initial and amended merger agreements. Furthermore, even if the mere failure to adequately consider certain options somehow constituted gross negligence, that showing would still be insufficient here in view of the exculpatory language in Bear Stearns’ certificate of incorporation.
Moreover, the record contains more than sufficient evidence that the board did carefully consider bankruptcy and related options, including the liquidation of some or all of the company’s business units. It was informed by its legal and financial experts that the company’s brokerage business was ineligible for a Bankruptcy Code chapter 11 reorganization, but would have to be liquidated pursuant to the receivership procedures of the Securities Investor Protection Corporation or chapter 7 liquidation.
Additionally, the board was advised by its experts that under either form of bankruptcy, the automatic stay protections of the Bankruptcy Code would not protect the company’s obligations under repurchase agreements, commodity contracts, forward contracts, swaps, master netting agreements and other derivative contracts, and collateral might be seized immediately. The record also shows that hazard believed that a bankruptcy filing would likely lead to further downgrades of the company’s debt ratings, making it difficult to continue doing business as a financial institution. Bear Stearns’ advisors further considered the company’s ability to obtain DIP financing, but were doubtful that it would be available. Ultimately, the board concluded that a merger was preferable to the uncertainty and complexity of bankruptcy, and that a bankruptcy filing or liquidation would likely result in no recovery for Bear Stearns’ stockholders and significant losses to its creditors.
Plaintiffs’ expert affidavits also fail to provide any basis to question whether the Bear Stearns board’s election of a merger was within the “range of reasonableness” or otherwise fair to the shareholders. While Morris opines that Bear Stearns’ stock may have been worth more than the $10 merger price, his own estimates are highly qualified and completely speculative. Among other things, he relies on analyst reports predating the liquidity crisis and market reaction following the merger announcement, and assumes that DIP financing would be avail *474 able to the company in bankruptcy. Ultimately, his opinion only manages to narrow the range of possible values to somewhere between $21 and $95 per share, a $70 margin of error. Accordingly, his affidavit merely confirms the difficulty in assigning any reliable value to the stock. It does not undermine the board’s decision to accept the certainty of the $10 offer.
The Wolf and Myers opinions likewise engage in speculation regarding the availability of bankruptcy financing, the stabilizing effect of asset sales, and the leverage Bear Stearns may have wielded by threatening a worldwide financial collapse. While it is outside the scope of the court’s review to pass a definitive judgment on any of these conclusions, it is notable that none of the experts have referenced a case study in which a similarly-situated company has secured substantial shareholder value after pursuing one of their bankruptcy-related strategies.
In this context, it is equally worth noting that the affidavit of defendants’ expert, Gilson, aggressively disputes plaintiffs’ assumptions and conclusions regarding share valuation, and regarding the feasibility of assets sales and DIP financing. Without affirmatively endorsing his opinion, it is sufficient to state that the doubts Gilson raises in opposition to plaintiffs’ position are substantial. The dispute between the experts is clearly one involving business judgment, which was within the board’s discretion to resolve. Even if the court could, with the luxury of reflection, conclude that one course of action was decidedly preferable over the other, such a conclusion at this time would impermissibly ignore the real-world time constraints under which the Bear Stearns board operated (see e.g. Citron v Fairchild Camera & Instrument Corp., 1988 WL 53322, 1988 Del Ch LEXIS 67 [May 19, 1988]).
Additionally, Bear Stearns shareholders were not the only cognizable victims of the liquidity crisis. Once a company is insolvent, its directors are burdened with additional fiduciary duties which may conflict with those owed to the shareholders (Production Resources Group, L.L.C. v NCT Group, Inc., 863 A2d 772, 790 n 57 [Del Ch 2004] [“When a firm is insolvent or near insolvency, the interests of its stockholders and creditors can be starkly divergent”]). At some point, in fact, the “creditors take the place of the shareholders as the residual beneficiaries of any increase in [the company’s] value” (North Am. Catholic Educ. Programming Found. v Gheewalla, 930 A2d 92, 101 [Del 2007]). Accordingly, the directors of an insolvent corporation must “consider, as fiduciaries, the interests of the *475 corporation’s creditors who, by definition, are owed more than the corporation has the wallet to repay” (Trenwick Am. Litig. Trust v Ernst & Young, L.L.P., 906 A2d 168, 205 [Del Ch 2006]). Indeed, the duties owed to the creditors near or after insolvency are such that the creditors are no longer relegated to pursuing mere contractual remedies, but may in some instances bring a derivative action to enforce their rights (North Am. Catholic Educ. Programming Found., 930 A2d at 101).
This does not imply that the fiduciary duties owed to the shareholders evaporate. The directors still have the “duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it” (North Am. Catholic Educ. Programming Found., 930 A2d 92, 103 [2007]) and are required to “engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation” (id.). But where the corporation’s very existence is threatened, the scrutiny focused upon deal protection devices in various contexts may very well be directed to shareholder consideration as well.
In this case, it is conceded that the consideration paid the shareholders was primarily an incentive to secure approval of the merger. The price was not related to Bear Stearns’ value as an ongoing concern, because the company was not an ongoing concern. Even with the merger, its continued existence and, thus, the value of its stock, was at best speculative. Under the circumstances, the payment of anything at all to the shareholders might be viewed as a breach of the duties owed to the company’s creditors. In seeking to maximize shareholder recovery, the directors were thus entitled to consider that the greatest amount they could demand might reasonably coincide with the lowest price sufficient to induce approval of the merger.
Plaintiffs do not dispute the law on this point. Rather, they assert that there was a question of fact as to whether Bear Stearns was insolvent, noting that the company did not file for bankruptcy. In fact, the unrebutted testimony of its officers and the federal officials involved with the merger establishes the company’s insolvency during the relevant period. The fact that the company ultimately refrained from filing for bankruptcy is of no moment (see e.g. Odyssey Partners, L.P. v Fleming Cos., Inc., 735 A2d 386, 417-420 [Del Ch 1999]; Geyer v Ingersoll Publs. Co., 621 A2d 784, 787 [Del Ch 1992]).
The Duty of Disclosure
Plaintiffs’ claim for breach of fiduciary duty also alleges that the director defendants violated their duty of disclosure in con *476 nection with the proxy statement. Specifically, plaintiffs contend that defendants failed to disclose numerous material facts in the proxy statement about the JPMorgan-Bear Stearns relationship in the critical March 13-24, 2008 period including but not limited “to . . . funding for Bear Stearns; possible alternatives; the government’s role; and what hazard did and did not do in connection with rendering its opinion that the merger consideration ‘was fair, from a financial point of view, to the holders of Bear Stearns’s common stock’ ” (plaintiffs’ brief at 52). Plaintiffs argue that questions of fact remain as to whether the allegedly omitted facts “altered the total mix of information available to shareholders in deciding how to vote on the proposed merger” (id.).
The claim alleging insufficient disclosure fails for several reasons. First, because plaintiffs have neither alleged nor proven that the purported omissions were made deliberately in bad faith, the claim is barred by exculpatory provisions of Bear Stearns’ certificate of incorporation adopted pursuant to Delaware Code Annotated, title 8, § 102 (b) (7) (see Zirn v VLI Corp., 681 A2d 1050, 1061-1062 [Del 1996]; In re Lukens Inc. Shareholders Litig., 757 A2d 720 [Del Ch 1999]).
Second, under Delaware law, directors seeking shareholder action owe a fiduciary duty to shareholders only to disclose “material” facts (In re MONY Group Inc. Shareholder Litig., 852 A2d 9, 24 [Del Ch 2004]; Loudon v Archer-Daniels-Midland Co., 700 A2d 135, 141 [Del 1997]). “Material facts are those facts for which there is a substantial likelihood that a reasonable [shareholder] would consider [them] important in deciding how to vote” (O’Reilly v Transworld Healthcare, Inc., 745 A2d 902, 916 [Del Ch 1999] [internal quotation marks and citations omitted]). However, “[o]mitted facts are not material simply because they might be helpful” (Skeen v Jo-Ann Stores, Inc., 750 A2d 1170, 1174 [Del 2000]), and “the law ought guard against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure” (Zirn v VLI Corp., 1995 WL 362616, *4, 1995 Del Ch LEXIS 74, *13 [June 12, 1995], affd 681 A2d 1050 [Del 1996]). To bury shareholders under “an avalanche of trivial information ... is hardly conducive to informed decisionmaking” (TSC Industries, Inc. v Northway, Inc., 426 US 438, 448-449 [1976]).
Accordingly, there is no requirement that a proxy statement set forth a “blow-by-blow description of events leading up to the proposed transaction” (Matador Capital Mgt. Corp. v BRC Hold *477 ings, Inc., 729 A2d 280, 295 [Del Ch 1998]; see also TCG Sec., Inc. v Southern Union Co., 1990 WL 7525, *7, 1990 Del Ch LEXIS 12, *22 [Jan. 31, 1990] [“The simple fact of the matter is that a reasonable line has to be drawn or else disclosures in proxy solicitations will become so detailed and voluminous that they will no longer serve their purpose”]).
The law “rejects the proposition that disclosure of the detailed facts and specific analyses underlying a financial advisor’s valuation methodology is automatically mandated in all circumstances” (In re Dataproducts Corp. Shareholders Litig., 1991 WL 165301, *8, 1991 Del Ch LEXIS 149, *23 [Aug. 22, 1991]).
The proxy statement is not the forum in which the directors may be compelled to explain the reasons they did not pursue a particular course of action (Lukens, 757 A2d at 736 [“requiring disclosure of . . . every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless”]). A plaintiff may not make out a disclosure claim merely by “posting] questions that are not answered in the proxy statement” (id.). Similarly, plaintiffs’ burden is not met by raising questions that “do no more than reflect the plaintiffs’ substantive allegations of wrongdoing” (id.).
The proxy materials provided to plaintiffs in this case easily met or exceeded the disclosure requirements. They provide a lengthy account of the merger negotiations and the reasons the director defendants ultimately decided to approve the merger. They describe daily, and sometimes hourly, discussions between Bear Stearns’ management, board and advisors, JPMorgan, the NY Fed, the Federal Reserve and the Treasury Department. Details regarding the proposals of other potential bidders were included, and the proxy contained an extensive discussion of the Lazard fairness opinion and the analyses underlying its conclusions. Plaintiffs’ questions regarding the disclosure simply restate, in the guise of identifying “omissions,” their substantive objections to defendants’ failure to pursue their experts’ preferred alternatives to the merger.
JPMorgan’s Motion for Summary Judgment
Plaintiffs’ claims against JPMorgan, like their claims against the Bear Stearns director defendants, derive largely from their objections to the terms of the merger. Accordingly, for the following reasons, JPMorgan’s motion to dismiss the claims for aiding and abetting a breach of fiduciary duty (second cause of action), breach of fiduciary duty (third cause of action), tortious inference (fourth cause of action) and unjust enrichment (fifth cause of action) is granted.
*478 Aiding and Abetting Breach of Fiduciary Duty
To establish aiding and abetting liability, plaintiffs must prove: (1) the existence of a fiduciary relationship; (2) a breach of a fiduciary duty; (3) knowing participation in the breach by a defendant; and (4) damages to the plaintiff, which resulted from the concerted action of the fiduciary and the nonfiduciary (In re Transkaryotic Therapies, Inc., 954 A2d 346, 370 [Del Ch 2008]; Malpiede v Townson, 780 A2d 1075, 1096 [Del 2001]; Kaufman v Cohen, 307 AD2d 113, 125 [1st Dept 2003]).[17]
The defendant must create or exploit conflicts on the other company’s board, or actively conspire with the board members (Malpiede, 780 A2d 1075, 1097-1098 [2001]). Merely driving a hard bargain on a short deadline, or even employing scare tactics, economic pressure or threats or “bullying,” will not give rise to an aiding and abetting claim (see Ryan v Lyondell Chem. Co., 2008 WL 2923427, *21, 2008 Del Ch LEXIS 105, *98 [July 29, 2008]; Malpiede, 780 A2d at 1097-1098; Weinberger v United Fin. Corp. of Cal., 1983 WL 20290, *13, 1983 Del Ch LEXIS 443 [Oct. 13, 1983]). Such a claim should be dismissed where the record demonstrates that “there was intensive arm’s-length bargaining between the parties with demands made and concessions granted on both sides” (Repairman’s Serv. Corp v National Intergroup, Inc., 1985 WL 11540, *9, 1985 Del Ch LEXIS 405, *26 [Mar. 15, 1985]).
Plaintiffs argue that JPMorgan’s knowing participation in a fiduciary breach should be inferred from the fact that “many of the transaction terms were illegal per se” (plaintiffs’ brief at 29). As discussed above, however, the deal protection devices were permissible under the circumstances and the Bear Stearns defendants did not breach their duties to the company’s shareholders. Absent a primary breach of fiduciary duty, aiding and abetting liability cannot attach to JPMorgan’s conduct. The record reflects arm’s length, nonstop negotiations in which both sides were aggressively represented by teams of professional legal and financial advisors. Plaintiffs have not alleged, much less proven, that JP-Morgan wrongfully created conflicts on Bear Stearns’ board or conspired with any of its members.
*479 Breach of Fiduciary Duty
Plaintiffs allege that JPMorgan is directly liable to them for breach of fiduciary duty because it was a “controlling or dominating shareholder” that exercised de facto control over Bear Stearns’ conduct (plaintiffs’ brief at 19). Specifically, plaintiffs allege that JPMorgan assumed actual management of Bear Stearns’ business after March 14, 2008, controlled the company by threatening to cease operational funding, controlled the shareholder vote and deprived the shareholders of a fair process and a fair price.
As a preliminary matter, JPMorgan cannot be liable for a breach of fiduciary duty for its role in bringing about the merger because, as discussed above, the Bear Stearns directors did not breach any duty in approving that transaction. In any event, plaintiffs’ claims regarding JPMorgan’s control are either contradicted by the record or irrelevant.
Under Delaware law, “[a] stockholder is not deemed controlling unless it owns a majority of the stock, or has exercised actual domination and control in directing the corporation’s business affairs” (In re Sea-Land, Corp. Shareholders Litig., 1987 WL 11283, *4, 1987 Del Ch LEXIS 439, *12 [May 22, 1987] [citations omitted]; Lewis v Leaseway Transp. Corp., 1990 WL 67383, *2 n 1, 1990 Del Ch LEXIS 69, *4 n 1 [May 16, 1990]). The plaintiff must show that the defendant exercised day-to-day control over the corporation’s conduct, or over the decisions with respect to the specific transactions at issue (see In re Western Natl. Corp. Shareholders Litig., 2000 WL 710192, *6, 2000 Del Ch LEXIS 82, *18 [May 22, 2000]). Merely showing that a shareholder had the potential to exercise domination and control is insufficient (In re Sea-Land, 1987 WL 11283, *5, 1987 Del Ch LEXIS 439, *13). Nor is it enough to show that the shareholders had leverage by virtue of certain contractual rights (Gradient OC Master, Ltd. v NBC Universal, Inc., 930 A2d 104, 130-131 [Del Ch 2007]). Thus, threatening to place a company into bankruptcy, or refusing to lend necessary funds will not demonstrate the requisite control (In re Marketxt Holdings Corp., 361 BR 369, 391-393 [SD NY 2007] [applying Delaware law]).
Plaintiffs have not demonstrated that JPMorgan was a controlling shareholder of Bear Stearns in a legal sense during the relevant period. Although JPMorgan was ultimately issued a 39.5% block of shares, at the time the merger was negotiated, JPMorgan owned a lesser amount of stock. It held no seats on *480 Bear Stearns’ board, and no one from the bank participated in the board’s deliberations regarding any of the decisions affecting the merger. Regardless of JPMorgan’s leverage, the parties negotiated aggressively over the consideration and other terms. Bear Stearns was independently advised by four law firms and its own financial advisor, and plaintiffs concede that a majority of its board consisted of independent directors. JPMorgan’s alleged threats to withhold funding in the course of the negotiations fail to constitute an issue of fact for the reasons stated above.
Plaintiffs have submitted no probative evidence that JPMorgan exercised actual managerial control over Bear Stearns in the period following the initial merger agreement. Instead, plaintiffs point to various unremarkable preparatory measures JPMorgan took in anticipation of reaching a final agreement, such as dispatching an advance team, engaging in communications regarding integration planning and managing risk, disseminating analyst reports and viewing daily profit and loss statements. However, plaintiffs have not identified a single material decision that JPMorgan made on Bear Stearns’ behalf that established that JPMorgan dominated Bear Stearns’ daily operations.
Finally, plaintiffs’ claim that Dimon abused his dual role as JPMorgan’s chairman and a NY Fed director in connection with the negotiations is unsubstantiated and irrelevant. The accusation apparently rests on the theory, raised in the Myers’ affidavit, that Dimon may have violated 18 USC § 208 (a). That statute prohibits federal employees, including any Federal Reserve Bank director, from “participating] personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a . . . contract ... in which [he] . . . has a financial interest.” (18 USC § 208 [a].) The statute’s concerns over conflicts of interest are also incorporated into the Code of Conduct promulgated by the NY Fed.[18]
*481 Plaintiffs’ brief does not cite or discuss the statute or the Code of Conduct or explain their bearing on this case. However, Myers’ implication that Dimon’s financial interest as a JPMorgan shareholder precluded his participation in the merger negotiations is erroneous. Dimon participated as an officer of JP-Morgan, not “personally and substantially” as a NY Fed director (compare United States v Irons, 640 F2d 872 [7th Cir 1981] [education program officer for the Department of Health, Education and Welfare, who supervised funding of educational programs, directed program bidders to contract with company in which he had a hidden interest]). The record reflects that the decisions concerning the federal loan facility were made by NY Fed chairman and CEO Timothy F. Geithner and the Federal Reserve Board of Governors in Washington, D.C. Myers’ conclusion that Dimon may have been acting in an official, governmental capacity because Dimon first suggested the dollar amount ($30 billion) of federal assistance is unsound, as every party to the transaction had the same interest in proposing, and negotiating over, that term. Moreover, Dimon’s alleged control (or even “domination”) of the negotiations is irrelevant to JP-Morgan’s aiding and abetting liability because the only pertinent inquiry is whether the independence of Bear Stearns’ board was compromised.
Tortious Interference/Unjust Enrichment
Plaintiffs’ remaining tort claims are duplicative of the failed causes of action discussed above. The claim that JPMorgan tortiously interfered with plaintiffs’ voting franchise simply repeats the objection to the share exchange agreement and, thus, the claim that JPMorgan aided and abetted Bear Stearns’ breach of fiduciary duty. The unjust enrichment claim also restates the aiding and abetting claim, asserting that JPMorgan conspired with or coerced the Bear Stearns board to pay the shareholders inadequate consideration.
Accordingly, it is ordered, that the motions for summary judgment are granted, and it is further ordered, that the complaint is dismissed.

. At oral argument the court determined that plaintiffs’ motion for attorneys’ fees would be considered upon a renewed application following the resolution of the summary judgment motions.

. The principal subsidiaries were: Bear, Stearns & Co. Inc.; Bear, Stearns Securities Corp.; Bear, Stearns International Limited; and Bear Stearns Bank pic (defendant Bear Stearns rule 19-a statement II1).

. Bienen is the president of Northwestern University; Harrington is the president of St. John’s University; Glickman is the presiding trustee and chairman of the Executive Committee of the Lexington Corporate Properties Trust; Nickell is the president and chief executive officer (CEO) of Kelso & Company; Novelly is chairman and chief executive officer of Apex Oil Company, Inc.; Williams is president and COO of Lockhart Companies Incorporated, a former partner of Covington & Burling LLB and a former chairman of the Federal Reserve Bank of Richmond; Tese is chairman of Wireless Cable International Inc.; Goldstein was the chairman and chief executive officer of Toys “R” Us; and Salerno was the vice chairman and CFO of Verizon Communications Inc.

. The third verified consolidated amended class action complaint (the complaint) consolidates five class action lawsuits filed in this court between March 17 and March 20, 2008, and two actions originally filed in the Delaware Court of Chancery in late March 2008 but brought to this court by way of complaints in intervention on April 10, 2008: Yun v Cayne (Sup Ct, NY County, index No. 650078/08); Kurtz v Cayne (Sup Ct, NY County, index No. 600780/ 08); Shaev v Cayne (Sup Ct, NY County, index No. 600781/08); Bobb v Green-berg (Sup Ct, NY County, index No. 600793/08); Louisiana Mun. Police Employees’ Retirement Sys. v Bear Stearns Cos. Inc. (Sup Ct, NY County, index No. 600830/08); Police & Fire Retirement Sys. of City of Detroit v Bear Steams Cos. (Del Ch, No. 3638-VCP); Wayne County Employees’ Retirement Sys. v Cayne (Del Ch, No. 3643-VCP).

. Defendants deposed Bear Stearns officers and/or directors James Cayne, Michael Goldstein, Alan Schwartz, and Vincent Tese; JPMorgan chairman James Dimon and JPMorgan managing director John R Chrin; hazard deputy *457 chairman Larry W. Parr; and NY Fed general counsel and executive vice-president Thomas C. Baxter, Jr.

. Article VIII of Bear Stearns’ restated certificate of incorporation provides, in relevant part, as follows:
“A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director’s duty of loyally to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived any improper benefit.”
Indeed, plaintiffs do not dispute that Bear Stearns’ certificate of incorporation precludes their claims, to the extent that they are premised upon a breach of the duty of care.

. Where the test is applicable, “the board must establish: (1) that it had reasonable grounds to believe that the hostile bid for control threatened corporate policy and effectiveness; and (2) that the defensive measures adopted were reasonable in relation to the threat posed” (Chesapeake Corp. v Shore, 771 A2d 293, 320 [Del Ch 2000]). The first part of the test is met by “demonstrating good faith and reasonable investigation” (Paramount Communications, Inc. v Time Inc., 571 A2d 1140, 1152 [Del 1989]), and the second by showing the response was not “draconian” and was within the range of reasonableness (Unitrin, 651 A2d at 1388). The “ ‘presence of a majority of outside, independent directors will materially enhance’ a board’s ability to meet this burden” under the Unocal test (Chesapeake, 771 A2d at 330).

. Although the directors could not know at the time of their decision, the later collapse of Lehman Brothers Holding, Inc., on September 15, 2008 would seem to validate their judgment, albeit postfact.

. See also Rand v Western Air Lines, Inc., 1994 WL 89006, *7, 1994 Del Ch LEXIS 26, *20 (Feb. 25, 1994) (upholding a 30% stock issuance because it provided a substantial benefit to stockholders “by keeping the only party expressing any interest at the table while achieving . . . assurances that the transaction would be consummated”), affd 659 A2d 228 (Del 1995); Thompson v Enstar Corp., 509 A2d 578, 583 (Del Ch 1984) (directors acted reasonably in granting a voting lock-up because they had searched for offers, but the only offer available “was contingent upon the adoption of the lock-up provisions”).

. If Revlon duties apply, the board “must act reasonably in order to secure the highest price reasonably available” (In re Lear Corp. Shareholder Litig., 926 A2d 94, 115 [Del Ch 2007]). To maximize the price, however, “there is no single blueprint that a board must follow to fulfill its duties” (Barkan v Amsted Indus., Inc., 567 A2d 1279, 1286-1287 [Del 1989]; In re Netsmart Tech., Inc. Shareholders Litig., 924 A2d 171, 192 [Del Ch 2007]; Ryan v Lyon-dell Chem. Co., 2008 WL 2923427, *12, 2008 Del Ch LEXIS 105, *51 [July 29, 2008] [“Delaware courts have not delineated the precise contours of a sale process because every transaction is different and every board confronts unique circumstances”]).

. See In re Sea-Land Corp. Shareholders Litig., 642 A2d 792, 806 (Del Ch 1993), affd 633 A2d 371 (Del 1993); Barkan, 567 A2d 1279, 1287-1288 (Del 1989) (directors fulfilled their Revlon duties where the board reasonably believed that no better offer would be available because cyclical downturn threatened the future performance of the corporation).

. See e.g. Commonwealth Assoc. v Providence Health Care, Inc., 1993 WL 432779, 1993 Del Ch LEXIS 231 (Oct. 22, 1993) (sale of 20% block of shares to management-friendly entity for purpose of blocking consent solicitation brought to replace chairman and members of board of directors; applying Blasius); Condec Corp. v Lunkenheimer Co., 230 A2d 769 (Del Ch 1967) (sale of 75,000 shares to third party to thwart corporate takeover; the traditional Unocal context).

. “Blasius is not easily or readily applied outside the context of matters touching on directorial control, as its demanding standard could unduly limit the legitimate exercise of directorial power and discretion in other contexts” (In re MONY Group, Inc. Shareholder Litig, 853 A2d 661, 675 n 51 [Del Ch 2004]).

. See QVC, 637 A2d 34, 42-43 (1994) (change of control occurs when “a majority of a corporation’s voting shares are acquired by a single person or entity” which acquires the “voting power to: [a] elect directors; [b] cause a break-up of the corporation; [c] merge it with another company; [d] cash-out the public stockholders; [e] amend the certificate of incorporation; [f] sell all or substantially all of the corporate assets”).

. See IXC Communications, Inc. v Cincinnati Bell, Inc., 1999 WL 1009174, *10, 1999 Del Ch LEXIS 210, *29 (Oct. 27, 1999) (“Neither the termination fee, the stock option agreements nor the no-solicitation provisions are defensive mechanisms instituted to respond to a perceived threat to a potential acquiror. In the absence of a showing of disloyalty or lack of care in agreeing to the termination fee, these provisions are reviewable as business judgments and are, thus, granted deference”); State ofWis. Inv. Bd. v Bartlett, 2000 WL 238026, *9, 2000 Del Ch LEXIS 42, *30-31 (Feb. 24, 2000) (business judgment rule applied because “[n]either the collar, termination fee, no talk/no shop provision, nor stock option agreements were used here as defensive mechanisms instituted to respond to a perceived threat from a potential acquiror making a competing bid”); see Revlon, 506 A2d at 176 (“lock-ups and related agreements are permitted under Delaware law where their adoption is untainted by director interest or other breaches of fiduciary duty”).

. See McMillan v Intercargo Corp., 768 A2d 492, 505 (Del Ch 2000) (“the no-shop permitted the Intercargo board to consider an unsolicited proposal that the board determined was likely to be consummated and more favorable to Intercargo’s stockholders than the XL merger . . . [t]he presence of this type of provision in a merger agreement is hardly indicative of a Revlon [or Unocal] breach”).

. Although the parties disagree as to whether Delaware or New York law applies to this claim, the law in both jurisdictions is the same (see JFK Family Ltd. Partnership v Millbrae Natural Gas Dev. Fund 2005, L.P., 21 Misc 3d 1102[A], 2008 NY Slip Op 51915[U], *23 n 18 [Sup Ct, NY County 2008]).

. The prohibitions of section 208 (a) do not apply where, under section 208 (b) (1), the government employee has disclosed his or her participation or interest in the transaction to the government official responsible for appointment to his or her position and “receive[d] in advance a written determination made by such official that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect.” Under section 208 (c) (1), the officials responsible for Dimon’s appointment were the Board of Governors of the Federal Reserve System, who *481 were actively involved in the negotiations and obviously knew of both his participation and his interest in JPMorgan. However, the question of their knowledge is irrelevant because plaintiffs have presented no evidence that Dimon was acting as a governmental employee in connection with the merger.